### JOHN T. BURKETT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 14001.    Promulgated June 28, 1927.

Certain instruments herein construed, as well as rights therein, and held to be oil and gas leases and not sales of capital assets within the meaning of section 206 of the Revenue Act of 1921.

*J. W. House, Esq.*, for the petitioner.
*J. Arthur Adams, Esq.*, for the respondent.

This is a proceeding for the redetermination of a deficiency in income tax for the year 1923, in the amount of $36,653.38. The errors assigned by the petitioner are (1) that the Commissioner refused to tax so much of his income as was derived from an oil and gas lease, under the provisions of section 206 of the Revenue Act of 1921, and (2) that the Commissioner erred in not apportioning the income from said lease equally between petitioner and his wife.

### FINDINGS OF FACT.

The petitioner is a resident of Pulaski County, Arkansas, and was at all times herein mentioned, the husband of Sula J. Burkett. On

April 13, 1923, the petitioner and his wife, executed, acknowledged and delivered to the Gulf Refining Co. of Louisiana, the following oil and gas lease:

OIL AND GAS LEASE.

John T. Burkett et ux to Gulf Refining Company of La.

THE STATE OF ARKANSAS
   *County of Ouachita*

SECTION 1.

PARAGRAPH 1.
*Know all men by these presents:*
   That John T. Burkett and Sula J. Burkett of the County of Ouachita, State of Arkansas, hereinafter called Lessor (whether one or more) have and by these presents do hereby lease, demise and let unto Gulf Refining Company of Louisiana, hereinafter styled Lessee, the tract of land hereinafter described, with the exclusive right of exploiting the same for and producing oil and gas therefrom, and to that end also grant, the exclusive right of drilling and operating thereon for oil and gas, together with rights of way for telephone and telegraph lines and right to lay pipe lines and operate the same for the purpose of conveying water, oil, steam and gas to erect, maintain and use storage tanks, sheds and buildings for the purpose of storing and caring for the minerals which may be produced, and the right to have and use sufficient water, oil, gas, wood and coal from the premises, free of cost, to operate and drill any wells that Lessee may bore or in the treating, so as to make merchantable, such minerals and also such other privileges as are reasonably requisite for the conduct of said operations, and the right to remove, replace and substitute material and machinery, to draw and remove casing from abortive and abandoned wells, and at the termination of this lease, to remove all property placed thereon by Lessee.
   This said land is situated in Ouachita County, State of Arkansas, and described as follows:
   SW ¼ of SW ¼, Section 6; N ½ of NW ¼; SW ¼ of NW ¼; S ½ of NE ¼; NW ¼ of NE ¼, N ½ of SW ¼, SW ¼ of SW ¼, NW ¼ of SE ¼, SE ¼ of NW ¼, Section 7; N ½ of SW ¼, Section 8; S ½ of NW ¼, SE ¼ of SW ¼, W ½ of SE ¼, Section 16; N ½ of NW ¼, Section 21; all in Township 15 South, Range 16 West, also—NW ¼ of NE ¼, SE ¼ of NE ¼ and E ½ of SE ¼, all in Section 12, Township 15 South, Range 17 West. Also NW ¼ of SW ¼, Section 3, Township 15 South, Range 16 West.
   It is agreed that for all purposes of this lease, there are embraced in this lease One Thousand (1,000) acres of land.
   PAR. 2. To HAVE AND TO HOLD unto said Lessee and to Lessee's successors and assigns for the term of seven (7) years from the date hereof and as much longer thereafter as oil or gas (or other minerals, if produced hereunder) are produced from said land. Provided that this lease shall not remain in force longer than fifty (50) years from this date, and provided, further, that a temporary cessation of production due to cleaning out, working over or drilling deeper of any well, or similar causes occuring after production secured, shall not terminate this lease. And lessor covenants that Lessor has good title to said land and will protect Lessee in the quiet and peaceable possession thereof.

PAR. 3. Lessee agrees to begin operations for the drilling of a well on the premises within twelve (12) months from the date hereof, or, failing so to do, Lessee agrees to pay in the manner below stated for each six (6) months' period for which such drilling is delayed, not to exceed eight (8) such periods, the sum of five hundred ($500.00) dollars such payment to be made on or before the beginning of each such period and shall be made by paying the same to the Lessor in person or to the Merchants & Planters Bank of Camden, Arkansas, or Lessee may mail Lessee's check to Lessor in said sum in care of said Bank, payable to Lessor, said Bank being hereby constituted Lessor's agent to receive said funds for Lessor or to receive and deliver said check to said Lessor, as the case may be; in either of the three methods of making such payment Lessee may use Lessee's check and the mailing of said check shall be deemed making payment; if Lessee shall fail to make such payment in advance as above provided, and such failure or defeat shall continue for thirty (30) days after the due date of such payment, Lessor shall have the right to forfeit this lease.

PAR. 4. In the case of change of ownership of the land herein leased, or some part thereof, whether by descent and partition, devise, conveyance or otherwise, the above designated Bank shall become the Trustee for all the owners to receive and distribute the rentals among them, and the payment of the rentals to such Bank shall prevent forfeiture of this lease. In case such Bank shall refuse to receive such payment, or shall go out of business, the Lessor or successors in interest, shall have the right to designate in writing some Bank as Trustee, and until such designation is made and Lessee notified in writing such rentals shall not be due and no forfeiture of this lease can be declared if such rental is paid within thirty (30) days after receipt of such notice by lessee.

PAR. 5. If while this lease is in force, as herein provided, Lessee shall have begun operations in attempt to find oil or gas, then without making any further payment, Lessee may continue such attempt, and may make as many attempts as Lessee pleases, but if Lessee shall abandon such attempts or ninety (90) days without finding oil or gas in paying quantities Lessee shall resume payment of the rentals falling due after the completion or abandonment of such well, at the next ensuing rental period beginning after such completion or abandonment provided Lessee shall have at least ninety (90) days from the date of such abandonment of operations in which to make such payment and on resuming payment of rentals Lessee shall have the right to continue making the same or of beginning operations for the drilling of a well and to alternate such rights.

PAR. 6. If operations shall not be begun on or before the expiration of five (5) years from this date, this lease shall wholly terminate, but if, prior to the termination of such five (5) years, Lessee shall have begun operations in attempt to find oil or gas and is engaged in such operations at the end of the five-year period, then Lessee shall have the right to continue such operations and also to make as many additional attempts to find oil or gas as Lessee desires beyond the expiration of said five year period; provided, however, that these attempts so extending such rights beyond such five years must be successive in the sense that, until oil or gas be found in paying quantities, not more than sixty (60) days shall elapse between the abandonment of work on one well and the beginning of operations on another, and provided further that this right to make attempts before the discovery of oil or gas, shall not continue in any event longer than seven (7) years from the date hereof.

## SECTION 2.

PAR. 1. If oil shall be found on said premises Lessee shall deliver as royalty to Lessor, free of expense, one-eighth (⅛) part of the oil saved from that produced, after deducting such part as may be used for drilling and operating on the land and treating the oil or gas so as to make it merchantable; such delivery to be made either into tanks supplied by Lessor with connections by Lessor provided, or into any pipe line that may be connected with the well; or Lessee may, at Lessee's option, buy such royalty oil, paying the current market price in the field at the time of production. If lessee shall operate so as to save and utilize casinghead gas from said premises, then Lessee shall pay as royalty to Lessor one-eighth (⅛) part of the value of such gas, calculated at the rate of four (4) cents per one thousand (1,000) cubic feet of the casinghead gas, calculation as to quantity to be made on the basis of four (4) ounces pressure above atmospheric pressure at the temperature of sixty (60) degrees Fahrenheit, as royalty on such casinghead gas, and such royalty accruing in each six months (period beginning from the date hereof to be paid within thirty (30) days after expiration of such period. If any well on said premises produces gas in paying quantities and such gas is used or marketed off the premises by lessee then lessee shall pay as royalty to lessor one-eighth (⅛) part of the value of such gas so used, calculated at the rate of two (2) cents per one thousand cubic feet.

PAR. 2. If, as result of any explorations under this contract, any other minerals than oil or gas shall be found in quantities deemed by the lessee to be paying, then lessee shall have the optional right to mine for and produce the same, applying to the Lessor, what, under all the circumstances, may be a reasonable royalty.

PAR. 3. All money royalties may be paid to Lessor as provided in Paragraph 3 of Section 1 hereof. Should the interest owned by Lessor in said land prove to be less than the whole, the royalties and rentals to be paid hereunder shall be paid to the Lessor in proportion only that Lessor's interest is to the entire interest or whole.

## SECTION 3.

PAR. 1. It is agreed that, without the valid written consent of both parties hereto, no well shall be drilled, no shaft sunk and no mining operations of any kind shall be carried on, within two hundred (200) feet of any dwelling houses now on said premises, and that the use of the surface of the land is hereby granted only so far as may be necessary or proper and convenient for the exercise of the rights herein granted.

## SECTION 4.

PAR. 1. The obligation of Lessee to offset wells on adjoining lands shall be to drill such offset wells as a prudent, responsible operator would drill under the same conditions if he owned the land hereby leased, subject to the following provisions, to wit:

When a well to offset an oil well on adjoining land is demandable under the above provision, the following agreement shall apply in such instance: It is agreed that a well will draw oil to an appreciable extent, for a distance of four hundred (400) feet from its center equally in all directions, and that all wells drilled within four hundred (400) feet of any of the lines of the land hereby leased which produce oil in paying quantities shall, subject to the first part of this Section, and where demandable under said part of this Section,

either be offset by a well drilled on the leased land, or at the option of the lessee, a royalty shall be paid to the Lessor based on the production of such well determined as follows: take the well to be offset as a center and transcribe around it a circle with a radius of four hundred (400) feet—that proportion of the total area of such circle which falls within the leased premises will be the proportion of the royalty which shall be paid on the production of the well to be offset; thus if that portion of such circle falling within the leased land is one-fourth (¼) of the total area of the circle, then one-fourth (¼) of the amount of royalty which would be payable if the well to be offset was on the leased premises, shall be paid; provided, if the Lessee so elects, an offset well may be drilled at any time, even after royalties have been paid, and from the beginning of such well no royalty shall be paid with respect to the well on the adjacent land. Such royalty to be a money royalty determined by the market value of the oil when produced. This provision shall also apply to offsetting gas wells, provided the gas is marketable at the time and place.

## Section 5.

Par. 1. Lessee further agrees to pay the actual cash value, at the time of destruction of any growing crops destroyed on said leased premises by operations hereunder, or the reasonable damage to any such crops caused by such operations.

## Section 6.

Par. 1. Lessee may pay off any lien or taxes now or hereafter due on or against said land, and if Lessee does so, Lessee shall be subrogated to all the rights of the holder of such lien or tax debt, and shall have a lien on all rentals and royalties accruing hereunder for reimbursement.

## Section 7.

Par. 1. When drilling or other operations are delayed or interrupted by storm, flood or other act of God, by fire, war, rebellion, scarcity of water, insurrection, riots, strikes, scarcity of labor, differences with employees, or failure of carriers to transport or furnish facilities for transportation or as the result of some order, requisition or necessity of the Government or as the result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against the lessee any thing in this lease to the contrary notwithstanding.

## Section 8.

Par. 1. Lessee is hereby given the right to surrender this lease at any time as to all or any part of the land hereby leased upon paying to the Lessor fifty cents per acre for each acre surrendered in addition to any sums that may be then due and accrued under the terms thereof, in the manner provided in Paragraph 3 of Section 1 hereof, and upon making such surrender the Lessee shall thereupon be released from all further payments, liabilities or obligations as respects the land surrendered, and the rentals provided for in Paragraph 3 of Section 1 hereof shall be reduced by the proportion of acreage surrendered to the whole.

## Section 9.

Par. 1. It is further agreed that all the conditions and terms herein shall extend to the heirs, executors, legal representatives, successors in interest

and assigns of the parties hereto, but no change of ownership of the land or part thereof, shall impose any additional obligation or burden on the lessee, and to that and lessor hereby covenants for himself, his heirs, assigns and successors in interest, that in case of any change of ownership of said land, or part thereof, whether by conveyance, will, inheritance, partition, or otherwise, all rentals and royalties accruing hereunder shall be paid to the new owners in proportion to their ownership of the whole of the land hereby leased so that no owner of a segregated part of said land shall be entitled to the whole royalties accruing from developments on said segregated tract, but only to such part of such royalty as the acreage in his tract is to the whole acreage embraced in this lease this covenant shall be taken and construed as a covenant running with the land and binding on all successors in interest to Lessor herein. The Lessee shall not be held responsible for the payment of such rentals or royalties to such new owner unless and until the Lessee shall be furnished with the instrument of transfer or a duly certified copy thereof and in case of no transfer in writing, with legally sufficient evidence thereof, such evidence of transfer to be furnished at least thirty (30) days before such royalties or rentals become due. If, by change in ownership, more than ten (10) separate parties become entitled to royalty Lessee may require, before paying royalty, that such parties so entitled designate in a writing furnished to the Lessee, one of their number, or a Trustee to receive the payment of the royalty for all of them.

## SECTION 10.

PAR. 1. It is further agreed that in the event this Leasehold shall be assigned as to a part or as to parts of the above described lands (and such right of assignment is hereby given) and the Lessee or assignee or assignees shall fail or make default in the payment of the proportionate part of the rentals due from him or them, such default shall not operate to defeat or affect this lease, in so far as it covers a part or parts of said land upon which the said Lessee or any assignee of the Lessee, shall make due payment of this proportionate part of said rental, but operations begun on any part of the leased premises will keep this lease in force as to all the premises upon which all rentals falling due prior to the beginning of such operations have been paid.

PAR. 2. It is further agreed that in case of change of ownership of parts of the land, or of this leasehold, that the rentals shall be apportioned in accordance with the acreage each transferee or assignee becomes entitled to.

PAR. 3. It is further agreed that any rentals paid and received hereunder shall constitute a consideration, not only for delay in drilling the well but for securing the right to pay future rentals to keep the lease in full force and effect until drilling is commenced, and any such rentals so paid shall be deemed and considered as adequate consideration for all the rights hereby granted.

It is understood that the privileges granted lessee herein includes the exclusive right to construct and operate pick-up stations on the aforesaid land.

It is also understood that no well shall be drilled for oil or gas on the Southeast quarter of the Northwest quarter of aforesaid Section 7, until oil be first discovered within one mile of same, and in no event shall any such well be drilled nearer than 100 feet of the negro grave yard located on this 40 acre tract of land.

Lessors covenant and agree with the lessee that said lands above described are wholly and entirely therein own, free from all liens and encumbrances and

that they will forever warrant and defend the title to same and to the rights herein conveyed against the claims of all persons whomsoever.

## SECTION 11.

PAR. 1. Lessee has this day paid to Lessor the sum of Twenty-five thousand ($25,000.00) Dollars, the receipt of which is hereby acknowledged, which payment is received in full payment and satisfaction and is deemed sufficient consideration for each and every right hereby granted. It is stipulated and agreed that this instrument embraces the entire contract between the parties, and that no promises or representations of any kind not embraced herein, have been made to induce the execution of this contract.

## SECTION 12.

PAR. 1. And I, Sula J. Burkett, wife of said John T. Burkett for and in consideration of the said sum of money, paid as a consideration for the foregoing, do hereby release and relinquish unto and in favor of the said Lessee, all my estate and right of dower, present and prospective, and of homestead in and to the above-described land, to the extent of the rights hereinabove set forth.

IN TESTIMONY WHEREOF, the parties hereto have duly executed this instrument, on this the 13th day of April, A. D. 1923. The parties hereto acting in person or by duly authorized agent.

(Here follow signatures.)

The cash consideration paid by the Gulf Refining Co. was $175,000. The total number of acres covered by the lease was 1,040. About fifteen years prior to October 21, 1922, Sula J. Burkett acquired the following parcels of land in Ouachita County, Arkansas, to wit:

West ½ of the Northwest ¼, West ½ of the Southeast ¼, Northeast ¼ of the Southwest ¼, Section 16, Township 15, Range 16; and the North ½ of the Northwest ¼, Section 21, Township 15, Range 16.

By a quitclaim deed dated October 20, 1922, acknowledged October 21, 1922, and recorded October 27, 1922, Sula J. Burkett conveyed the fee simple title to the above-described 280 acres of land to the petitioner for the recited consideration of $1. No valuable consideration passed.

By deed dated February 24, 1899, W. T. Jones conveyed to the petitioner and his wife, Sula J. Burkett, the following described parcels of land in Ouachita County, Arkansas:

West ½ of the Northeast ¼; East ½ of the Northwest ¼; and Southeast ¼ of the Southwest ¼, all in Section 7, Township 15, Range 16.

All of the above land, except the southeast one-fourth of the southwest one-fourth of section 7 was included in the above oil and gas lease. All the remaining parcels of land described in said oil and gas lease were owned by petitioner in fee simple for more than two years prior to the date of said lease. All the property described in the lease was held by petitioner, or by him and his wife jointly, for gain.

OPINION.

MILLIKEN: Petitioner's contention that he and his wife owned in equal parts the property leased to the Gulf Refining Co., is not sustained by the record. All the lands included in the oil and gas lease, excepting that which the petitioner acquired from his wife in October, 1922, and that which he owned jointly with his wife, were purchased by him with his own funds and title taken in his own name. When boiled down, this contention of the petitioner is as stated by him in his testimony that he considered that his wife had a one-half interest in everything that he owned. Outside of this general claim, the record disclosed no fact which justifies this contention. It is not shown that petitioner recognized this claim in his dealings with his wife. If the income or expenses were ever divided equally between petitioner and his wife, the record does not disclose such fact.

His next claim is that it was not intended when the deed to the 280 acres was executed in October, 1922, that he should be invested with the complete ownership of the property transferred to him by his wife. Petitioner stated at the hearing that the deed was executed in order that he might have complete control of the land for the purpose of leasing it. It appears, however, that no conveyance was made by petitioner's wife to him of her one-half interest in the 160 acres which they owned jointly. On the other hand, Sula J. Burkett joined in the oil and gas lease, not only for the purpose of leasing her joint interest in the 160 acres owned jointly by her and petitioner, but also for the purpose of relinquishing her dower and homestead rights in the remainder of the property leased. The evidence in the record is not sufficient to show that the deed from Sula J. Burkett to the petitioner, conveyed any title other than that which it purported to convey. It conveyed a fee simple title. There is nothing in the record to show in what proportion the respondent taxed to the petitioner and his wife, the income derived from the oil and gas lease, and, therefore, we can not say that he erred. It is sufficient to hold that petitioner's contentions that his wife was the owner of a one-half interest in the lands leased to the Gulf Refining Co. and that the deed from her to him, of October 20, 1922, did not vest in him the beneficial title to the 280 acres thereby covered, are not sustained by the evidence in the record.

The claim of petitioner that the oil and gas lease to the Gulf Refining Co. of Louisiana constituted a sale of capital assets, and, therefore, entitled him to the benefit of section 206 of the Revenue Act of 1921, must be denied under the authority of *Henry L. Berg*, 6 B. T. A. 1287.

108346°—28——39

It may be pointed out that petitioner acquired the 280 acres conveyed to him by his wife in October 1922, less than two years before the date of the oil and gas lease.

*Judgment will be entered for the respondent.*